UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MONICA MARTINEZ,

        Plaintiff,

    v.

MICHAEL J. ASTRUE,

        Defendant.

Case No.  12-cv-02997-JCS

**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**

**Dkt. Nos. 17, 20**

I.     **INTRODUCTION**

      Plaintiff Monica Martinez seeks review of the final decision of the Commissioner of the Social Security Administration (hereafter, "Defendant" or "Commissioner") denying her application for Social Security Income and Social Security Disability Insurance benefits.  Plaintiff asks the court to reverse the Commissioner's denial of benefits and either remand for an award of benefits or for an additional administrative hearing.  The parties have filed Cross-Motions for Summary Judgment.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Cross-Motion for Summary Judgment, REVERSES the decision of the Commissioner and REMANDS the case for further proceedings consistent with this Order.[1]

II.    **BACKGROUND**

    A.    **Procedural History**

      On or about May 21, 2009, Plaintiff filed applications for Supplemental Social Security

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    Income ("SSI") and Social Security Disability Insurance ("SSDI") benefits.  Administrative

2    Record ("AR") 19.  In her filing, Plaintiff alleged disability beginning on November 1, 2008.  *Id*.

3    Her application was denied on September 10, 2009.  *Id*.  Plaintiff's "Request for Reconsideration"

4    was denied on March 30, 2010.  *Id*. at 111.  An administrative hearing took place February 16,

5    2011 before an Administrative Law Judge ("ALJ").  *Id*. at 37.  The ALJ issued a decision dated

6    March 28, 2011 denying Plaintiff's claim.  *Id*. at 20.  Plaintiff appealed the ALJ's decision to the

7    Appeals Council on March 28, 2011, and submitted additional evidence to the Appeals Council

8    that had not been considered by the ALJ.  *Id*. at 14.  The Appeals Council denied Plaintiff's

9    request for review of the ALJ's decision, which made the ALJ's decision the "final decision" of

10   the Commissioner.  *Id*. at 1-3; *see also* 42 U.S.C. § 405.

11          Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction

12   to review the final decision of the Commissioner.  *See id*.  Plaintiff filed a motion for summary

13   judgment asking the Court to reverse the Commissioner's denial of benefits.  Dkt. No. 17

14   ("Plaintiff's Motion").  The Commissioner filed a cross-motion for summary judgment.  Dkt. No.

15   20 ("Commissioner's Motion").  Plaintiff also filed a reply to the Commissioner's Motion.  Dkt.

16   No. 23 ("Plaintiff's Reply").

17          **B.      Factual Background**

18          Plaintiff is from San Francisco, California, and was forty-two when she filed her

19   application for SSI and SSDI benefits on November 1, 2008.  AR 155.  Plaintiff has a high school

20   education.  *Id*. at 317.  She has been married and divorced twice.  *Id*.  Plaintiff has two sons, the

21   younger of whom she currently lives with.  *Id*. at 317, 487.

22          Prior to her disability claim, Plaintiff was self-employed as an Adult/Child Care Worker.

23   AR 191.  In this role, she cared for elderly people and assisted them in their daily activities

24   including helping them with chores and medications.  *Id*. at 192.  After varicose vein surgery in

25   October of 2008, Plaintiff did not return to work.  *Id*. at 199.  In her original filing for Social

26   Security benefits, plaintiff alleged she was unable to return to work because of a back injury,

27   irritable bowel syndrome, food allergies, a tumor in her uterus, and anemia.  *Id*.  Plaintiff noted

28   she had a hysterectomy in November of 2009.  *Id*. at 240.  Plaintiff has not engaged in any gainful

United States District Court
Northern District of California

2

employment since November 1, 2008. *Id*.

    **C.**    **Plaintiff's Medical Evidence that was Considered by the ALJ**

        **1.**    **Psychiatric History**

In support of her claim, Plaintiff submitted a multidisciplinary evaluation from the Department of Neurology, Memory and Aging at the University of California San Francisco ("UCSF"). *See* AR 302. This evaluation, which took place March 24, 2006, consisted of a neurological evaluation, neuropsychological testing, caregiver interview, psychiatric screening, and functional assessment. *Id*. During this evaluation, Plaintiff reported problems with her short term memory; specifically, she reported misplacing objects, forgetting conversations, and becoming easily distracted. *Id*. Plaintiff described "the severity of her memory problems as moderate-to-severe." AR 303. Plaintiff reported being, "highly reliant on written reminders . . . [and] disoriented in familiar environments." *Id*. Additionally, Plaintiff reported she had difficulty planning and motivating and often felt "overwhelmed by the task at hand." *Id*.

Plaintiff also reported "a history of head trauma starting from childhood when she was beaten by her half-brother and adult caregivers." AR 302. This trauma continued into adulthood as she was the victim of domestic violence. *Id*. The evaluation stated that the last significant head trauma Plaintiff sustained was in 1999 or 2000 when her head was slammed into a wall. *Id*. "An MRI at the time showed several nonspecific punctate foci of signal abnormality involving the subcortical white matter." *Id*.

With regards to behavioral and neuropsychiatric symptoms, the evaluation stated Plaintiff "endorses apathy, decreased motivation, intermittent depression, anxiety, emotional liability, and irritability." AR 303. Plaintiff's son reported "some obsessive-compulsive behavior in the form of washing and checking things, although [Plaintiff] denied this." *Id*. It was unclear whether Plaintiff was diagnosed with possible bipolar affective disorder. *Id*. She was not on a mood stabilizer at the time of the March 24, 2006 evaluation. *Id*.

The UCSF evaluation indicated Plaintiff's physical examination was "notable for a subjective asymmetric diminished sensation on the right side of [Plaintiff's] body including face, upper and lower extremity [sic]." AR at 306. This sensation was "described [by Plaintiff] as a

1    'delayed' sensation despite being intact to light touch, pinprick, temperature, and vibration." *Id.*

2    Other testing revealed Plaintiff had "impairments in verbal memory, abstract reasoning, problem

3    solving, verbal fluency . . . and attention." *Id.*  The evaluation pointed to Plaintiff's repeated head

4    injuries, a possible demyelinating disorder, or a possible bipolar disorder as potential causes.

5        In another exam dated June 12, 2006, doctors from UCSF's Multiple Sclerosis Center

6    indicated that Plaintiff's symptoms were "not suggestive of multiple sclerosis." AR at 311.

7    However, the doctors noted that two MRIs Plaintiff had taken in 2002 and 2006 show "T2 white

8    matter irregularities," which did indicate a clinical history "suggestive of bipolar disorder type 1

9    disease." *Id.*  Plaintiff's "denial that anything is wrong, her irritability, her strange bouts of

10   energy, her lack of sleep and her somewhat intrusive behavior" supported this diagnosis.  *Id.*

11                  **2.      MRIs of Spine and Brain**

12       On July 6, 2007, Plaintiff had MRIs taken of the thoracic and lumbar spine after

13   complaining of back pain.  AR 312.  With respect to the thoracic spine, the MRI indicated "normal

14   alignment of the vertebral bodies."  The MRI showed "no significant degenerative changes,"

15   including no "demonstrate[d] spinal canal or neural foraminal stenosis."  *Id*.  The radiologist

16   indicated that "[a] single sagittal image of the cervical spine was submitted" which

17   "demonstrate[s] posterior disk bulge at C4-C5, C5-C6 and C6-C7," and noted that "this could be

18   more definitively evaluated with a targeted MRI of the cervical spine as clinically indicated."  *Id*.

19       With respect to the lumbar spine, the MRI indicated "mild spondylitic changes throughout

20   the lumbosacral spine."  AR 313.  The radiologist wrote that there was "minimal posterior

21   subligamentous disk bulge identified at L2-L3, L3-L4, and L4-L5," and noted that there was "no

22   spinal canal or neural foraminal stenosis at these levels."  *Id*.  At L5-S1, the MRI showed a "mild

23   central posterior disk bulge/protrusion with slight impression on the ventral aspect of the thecal

24   sac," but still "no spinal canal or neural foraminal stenosis." *Id*.

25       On July 10, 2007, Plaintiff had a MRI of her brain at St. Luke's Hospital as a follow up to

26   reexamine a "white matter lesion on a prior MRI."  AR 314.  The radiologist found "small

27   scattered T2 hyperintensities in the deep white matter on the centrum semiovale bilaterally,"

28   which were "identical to the prior exam."  *Id*.  No new lesions were identified.  *Id*.  The radiologist

United States District Court
Northern District of California

4

noted these hyperintensities "may represent the residua of a stable demyelinating process (i.e. multiple sclerosis)." *Id.* Other than those hyperintensities, the MRI of Plaintiff's brain was normal. *Id.*

That same day, Plaintiff also had a MRI taken of her cervical spine. AR 314. The MRI notes that at the C3-C4 level, there was "a mild posterior central protrusion of the disk which does not touch the spinal cord." *Id.* at 315. At the C4-C5 level, there was "a broad-based posterior protrusion of the disk which is greater on the right side. This disk protrusion "extend[ed] into the right neural foramen, creating moderate to severe neural foraminal stenosis." *Id.* There was also "mild uncinate spurring on the left side creating mild left neural forminal stenosis." *Id.* At the C5-C6 level, the MRI showed "a broad-based posterior central protrusion of the disk with dorsal ridging of the vertible body endplates creating moderate to severe central stenosis." The radiologist's final impression was as follows:

> Moderate central stenosis of C4-5, C5-6, C6-7 levels secondary to the posterior central disk herniations with dorsal ridging of the vertebral body endplates. This is most pronounced at the C5-6 level. The spinal cord is slightly compressed; however, there is no evidence of cord edema at any level.

*Id.* The final impression also noted "[m]ultilevel bilateral neural stenosis." *Id.*

### 3. Dr. Senter – Plaintiff's Treating Physician

On December 9, 2010, Plaintiff's treating physician, Dr. Senter, gave her professional opinion regarding Plaintiff's ability to do certain tasks taking into account Plaintiff's limitations caused by her impairments. *See* AR at 830-33. Dr. Senter reported that Plaintiff could occasionally lift less than 10 pounds, stand and/or walk for less than 2 hours in an 8-hour workday, sit less than 6 hours in an 8-hour workday (while having to periodically sit and stand to relieve pain or discomfort). *Id.* She further noted that Plaintiff was limited in pushing and pulling in both her lower and upper extremities, as well as her ability to reach in all directions, including overhead. Dr. Senter wrote that Plaintiff could only occasionally climb or balance, and that she could never kneel, crouch, crawl or stoop. *Id.* at 831.

Dr. Senter wrote that it was medically reasonable to expect that Plaintiff's ability to maintain attention and concentration on work tasks throughout an 8-hour workday would be

United States District Court
Northern District of California

5

significantly compromised by both pain and her prescribed medication.  *Id*.  at 832.  She noted the following environmental limitations: temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals and gases.  *Id*. at 833.  Dr. Senter noted that "Patient does report occasional hot flashes and heat intolerance.  Dust causes her asthma to act up, as does dampness and mildew."  *Id*.

### 4.    Dr. Johnson – Consultant Psychiatric Examiner

Plaintiff underwent a psychiatric exam by Ronald F. Johnson, M.D. ("Dr. Johnson"), on August 20, 2009.  AR at 317.  The purpose of this exam was to determine Plaintiff's eligibility for disability benefits.  *Id*.  During the exam, Plaintiff described her daily routine:

> I get up in the morning, pace the floor . . . or lay in bed and take my meds . . . I get up between ten and eleven in the morning . . . I wait for my son to come home . . . we do some shared cooking . . . I can't sleep at night because of arthritis . . . I have pain in my spine, hips, neck, and pelvic area.

AR at 318.  Plaintiff went on to explain that she "[doesn't] like people" and that she doesn't have a social life as a result.  *Id*.

Dr. Johnson found Plaintiff suffered from a "[m]ood disorder with mixed moderate to marked anxiety and depressive features in the context of her multiple stated medical symptoms and conditions."  Additionally, Dr. Johnson found Plaintiff suffered from a pain disorder associated with both psychological factors and a general medical condition.  AR at 319.  Dr. Johnson deferred to the medical reports with regards to the medical conditions and medical symptoms associated with this pain and mood disorder.  *Id*.  Dr. Johnson also found that Plaintiff had an "[u]nderlying personality disorder, mixed features (with depressive, narcissistic, impulsive, and borderline traits)."  AR at 319.  Dr. Johnson noted Plaintiff had a "[l]ife circumstance problem (facing her early and middle forties and the challenges of adult functioning in that decade of life, now in the context of her multiple medical symptoms and conditions)."  *Id*.

Dr. Johnson, while noting that his examination was limited in scope as it was based upon one session with Plaintiff, concluded given the evidence presented, Plaintiff "would have moderate difficulties concentrating and focusing on simple, sustained work tasks."  *Id*.  Additionally, Plaintiff "would have further difficulties, even marked, in the context of

1    requirements to fulfill a full 8-hour workday or full 40-hour workweek." In support of this

2    conclusion, Dr. Johnson pointed to Plaintiff's difficulty in "communicating effectively and

3    appropriately in a work environment that required coordination and back-and-forth tasks-oriented

4    communications." *Id*. Dr. Johnson stated "[plaintiff's] anxious tension and irritability would be

5    clearly apparent to others in a workplace." AR at 320. However, Dr. Johnson also noted that

6    Plaintiff would have "no discernible difficulties maintaining attendance in locations, based purely

7    upon her psychiatric condition." *Id*.

8            With regards to a long-term prognosis, Dr. Johnson found that Plaintiff would "benefit

9    from ongoing regular counseling, and psychotherapy with further exploration of anti-depressant

10   medications." *Id*. However, Dr. Johnson noted that Plaintiff's long term prognosis "will depend

11   upon continuing assessment, possible treatment options, and the clinical course of her multiple

12   stated medical conditions." *Id*.

13                   **5.    Dr. Gable – Consultant Medical Examiner**

14           Plaintiff underwent a medical exam by Dr. Clark E. Gable ("Dr. Gable") on August 14,

15   2009. AR at 322. The purpose of this exam was to determine Plaintiff's eligibility for disability

16   benefits. *Id*. At this exam, Plaintiff's chief complaints were chronic tiredness, asthma, irritable

17   bowel syndrome, long standing disk disease of both the neck and the lumbar areas, heavy bleeding

18   with significant fibroid disease, and venous strippings, which have caused ongoing leg pains. *Id*.

19           Dr. Gable noted during the physical exam that Plaintiff's abdomen was "quite bloated" and

20   that she was "[t]ender in the belly." *Id*. Plaintiff could "flex [her neck] 0 to 40 degrees and extend

21   about 0 to 50 and rotation about 0 to 60 to the right and left." *Id*. Dr. Gable found Plaintiff's neck

22   was "moderately tender over the posterior cervical area with spasm as well as in the upper

23   boarders of the trapezius." AR at 323. Dr. Gable noted "the range of motion about her shoulder

24   appears to be normal." *Id*. Dr. Gable also noted that Plaintiff could "anteroflex and nearly touch

25   her toes." *Id*.

26           Dr. Gable's conclusive impressions of the Plaintiff at the time of his exam were that she

27   had "significant psychiatric problems" with little or no treatment as she was "not currently on any

28   psychiatric medicines and not seeing a psychiatrist." *Id*. He further concluded that she has "quite

United States District Court
Northern District of California

1   significant" irritable bowel syndrome that "should be helped by her stopping iron [supplements]

2   and Ibuprofin." *Id.* This is in addition to her "spastic colon, which would benefit from additional

3   medications." *Id.* Dr. Gable also concluded Plaintiff "has degenerative disk disease in her neck . .

4   . with chronic pain" and "that she apparently has ongoing fibroids, for which she may need a

5   hysterectomy." *Id.*

6       With regards to a functional capacity assessment, Dr. Gable wrote:

7           As best I can tell, she could probably [sit] up to six hours a day with
            usual breaks. I think she could stand and walk possibly up to six
8           hours depending upon her degree of pain. She could lift 20 pounds
            frequently and possibly 40 pounds occasionally, and I don't see any
9           problems with fine finger and hand movements.

10  *Id.* Dr. Gable went on to note Plaintiffs psychiatric problems were "beyond the purview of his

11  evaluation." *Id.*

12              **6.      Physical Residual Functional Capacity Assessment by Dr. Bradus**

13      On September 2, 2009, medical consultant Dr. J. Bradus, M.D. completed a Residual

14  Functional Capacity Assessment ("RFC") based on a review of Plaintiff's medical records. AR

15  327-31. This RFC was purportedly based on all evidence in Plaintiff's file. AR 327. Dr. Bradus

16  found that Plaintiff could: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or

17  carry 10 pounds; (3) stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-

18  hour work day; and (4) sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.

19  AR 328. Additionally, Dr. Bradus found Plaintiff could push and/or pull (including operation of

20  hand/foot controls) without limitation in either the upper or lower extremities. *Id.* Dr. Bradus

21  determined Plaintiff could frequently climb ramps/stairs, occasionally climb ladders, ropes, and

22  scaffolds, and frequently balance, stoop, kneel, crouch, and crawl. In support of these

23  determinations, Dr. Bradus stated:

24          [Claimant] has [history] of periodic pelvic pain and fibroids with
            allegations of bleeding however recent [hematocrit is within normal
25          limits], including current. [Claimant] has [history] of diarrhea and
            abdominal pain and irritable bowel disease [diagnosed]. No weight
26          loss. [Claimant] has [abnormal] back x-ray with mild [degenerative]
            changes but no back [treatment] and exam at CE showed mild
27          decrease in [range of motion] and some [tenderness to palpation].
            No evidence of severe food allergies or asthma.

28

United States District Court
Northern District of California

8

AR 328.  Dr. Bradus also determined that Plaintiff had no manipulative limitations, visual

limitations, communicative limitations, or environmental limitations. AR 329-30.

Dr. Bradus also determined Plaintiff was only "partially credible" with regards to her

allegations and symptoms.  AR 333.  In support of this conclusion, Dr. Bradus pointed to the fact

Plaintiff "has not had documented severe back disease, weight loss, or severe persistent anemia."

AR 334.

### 7.     Psychiatric Review Technique and Mental RFC Assessment by Dr. Lucila

Also on September 9, 2009, a Psychiatric Review Technique, including a Psychiatric RFC,

was completed by Dr. D. Lucila.  AR 336-49.  Dr. Lucila determined Plaintiff had several

"medically determinable impairment[s] . . . that [did] not precisely satisfy the diagnostic criteria"

listed.  AR 339.  These impairments were in the form of an affective disorder, somatoform

disorder, and a "mixed" personality disorder.  *Id*.  With regards to functional limitations, Dr.

Lucila found Plaintiff had mild restrictions on "activities of daily living" and moderate difficulties

in "maintaining social functioning" and "maintaining concentration, persistence, or pace."  AR

344.  Dr. Lucila noted there was insufficient evidence to support any degree of limitation with

regards to extended episodes of decompensation.

Dr. Lucila's Psychiatric RFC found Plaintiff was "moderately limited" in her ability to: (1)

maintain attention and concentration for extended periods of time; (2) complete a normal workday

and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; (3) interact

appropriately with the general public; (4) accept instructions and respond appropriately to

criticism from supervisors; (5) get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; and (6) maintain socially appropriate behavior and to adhere to

basic standards of neatness and cleanliness.  AR 347-48.

### D.     The Administrative Hearing

#### 1.     Plaintiff's Testimony

The ALJ held an administrative hearing on February 16, 2010.  AR 19.  Plaintiff testified

United States District Court
Northern District of California

United States District Court
Northern District of California

1    she could not work due to mental and physical issues. AR 42. With regards to Plaintiff's mental

2    issues, Plaintiff testified she had a problem with anxiety and she had been prescribed Trazodone, a

3    sleeping medication, to help. *Id*. Plaintiff testified that this medication did not help and only gave

4    her irritable bowel syndrome. *Id*. When asked about whether she talked to her psychiatrist about

5    any other medications that might help with her anxiety, Plaintiff testified she was on medication

6    that made her "manic-depressive and [she] charged up [her] credit cards about $30,000." AR 42.

7    Plaintiff further testified she has a difficult time getting along with people. AR 44. When asked

8    the cause of this, Plaintiff testified she was the victim of physical abuse and suffered from post-

9    traumatic stress disorder. *Id*. When asked whether she has had any treatment for the anxiety or

10    the problems getting along with other people, Plaintiff testified she has taken a stress management

11    class and gone to church. *Id*. Plaintiff testified that neither of these activities made a difference

12    and that she "feels like [she doesn't] fit in anywhere." *Id*.

13        With regards to physical issues, Plaintiff testified she currently is not on medications for

14    bipolar and that she has some "mild cognitive impairment" that makes it difficult for her to learn

15    new things. AR 47. As for the cause of these impairments, Plaintiff testified she hit her head

16    many times and has brain damage. *Id*. Plaintiff further testified she had pain in her spine, neck

17    and lower back that inhibited her ability to comb her hair. AR 49. When asked by the ALJ if

18    there were any further physical problems that kept Plaintiff from working, Plaintiff testified,

19    "Physically, mostly just being able to get ready and to−it takes me like four or five hours just to

20    try to get ready." AR 49.

21        The ALJ went on to question the Plaintiff about the onset date of her physical and mental

22    problems. AR 50. The ALJ asked, "since you already had these problems before . . . was there

23    anything that changed in October of 2008, when you stopped working, that made any difference in

24    your ability to work?" AR 51. Plaintiff testified her varicose vein surgery was the impetus for the

25    change in circumstance. *Id*. Plaintiff further testified:

26              then my periods started spinning out of control and I was having two
                periods a month, that lasted about two-and-a-half weeks, and I was

27              hemorrhaging and became anemic and I was bed ridden and laying
                on the couch for months and months at a time before they decided to

28              do surgery to remove my uterus.

United States District Court
Northern District of California

1    *Id.* When asked whether the hysterectomy solved the problems of heavy periods, Plaintiff

2    responded that it did, but then she continued to have problems getting in and out of bed due to

3    continuing pelvic pain.  AR 52.  When asked how the pelvic pain keeps her from working,

4    Plaintiff responded "the pain keeps me from getting dressed . . . I'm mostly in my pajamas all day

5    long." *Id.* Plaintiff further testified, "How am I going to leave the house when I'm peeing my

6    pants? Sir, I have a problem peeing half the time."  AR 53.

7         In response to her own attorney's questions, Plaintiff testified that her employment prior to

8    2008 only consisted of light cleaning and helping her friend with her children.  *Id.*  Plaintiff

9    testified, "I just have a problem when I sit or stand for more than a half-hour to an hour.  If I'm

10   walking, that doesn't bother me.  What bothers me, when I sit or stand for long periods of time."

11   AR 54.  Plaintiff's attorney asked whether Plaintiff does any chores and if so, how does she feel

12   after doing them.  *Id.*  Plaintiff responded she does some light cleaning and when she tries to

13   "challenge herself to do like the tub or the floor . . . then [she] might end up bedridden for

14   three/four days at a time." *Id.*  When asked if she drives, Plaintiff responded she does, but can

15   only drive for a half-hour and then the circulation to her lower abdomen gets cut off "trigger[ing]

16   the chronic pain." *Id.*

17        The ALJ again questioned Plaintiff regarding her medical history.  AR 57.  He asked

18   whether Plaintiff remembered telling her doctor: "I've been building a case of disability for 15

19   years." *Id.*  Plaintiff responded she did remember saying that to her doctor.  *Id.*  The ALJ went on

20   to ask, "You indicated that you were trying to convince [the doctor] that you're really sick

21   mentally and then . . . you hinted to the doctor that you really want help with getting your General

22   Assistance and Disability.  So what actually was the story of what you were trying to

23   accomplish?"  AR 57-58.  Plaintiff attempted to respond to the question, but was unable because

24   the ALJ criticized her for interrupting his question, and then moved on.  AR 58.  Throughout the

25   hearing, it was clear that the ALJ's frustration with Plaintiff grew as she spoke out of turn.

26                    **2.     Medical Experts' Testimony**

27        The ALJ questioned Dr. Singer, a psychiatrist, about his assessment of Plaintiff's

28   conditions.  AR 60-66.  Dr. Singer diagnosed Plaintiff with a mood disorder, a pain disorder, and a

personality disorder, but said that either individually or in combination, "these psychiatric impairments do not reach a level of meeting or equaling a listing." AR 61, 63. Dr. Singer testified "the issue that makes it very difficult to treat this woman is the personality disorder. She seems to have a knack for getting into conflict with people." AR 62. Dr. Singer testified "this would impose limitations in terms of [Plaintiff] dealing with supervisors and co-workers." *Id*. Dr. Singer also referenced Plaintiff's General Assessment of Functioning ("GAF") scores "in the range of 60" as a basis for his conclusion that plaintiff does not meet the listed impairments. AR 63.[2]

With regards to treatment, Dr. Singer testified, "I think that [the prior attending physicians] tried to talk to the [Plaintiff] about a mood stabilizer and I don't think she was receptive to that or it didn't work." AR 64. Dr. Singer went on to say, "People with the kinds of disorders that [Plaintiff] has, and the nature of the disorders are frequently quite difficult to treat, and particularly when they have a strong conviction that they've been mistreated by Government agencies and so on." *Id*. Dr. Singer noted that "the advocacy of her disability is an important focus of her life and she's not been particularly amenable to psychiatric treatment." AR 65.

The ALJ asked Dr. Singer what functional limitations he should consider in his decision. *Id.* Dr. Singer testified Plaintiff should be limited in dealing with the public, co-workers, and supervisors and limited to simple one and two-step processes. *Id.*

The ALJ then questioned Dr. White, a medical expert, about his assessment of Plaintiffs condition. AR 67-76. Dr. White testified that Plaintiff did "not meet a listing or an equivalent." *Id*. at 68. When asked whether she had a medically determinable impairment, Dr. White testified that "[s]he has symptoms of pain." *Id*. Dr. White elaborated: "Most of it is really pain, and on physical examination, she has perfect range of movement. There is no significant muscle atrophy

---

[2] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th Ed. 2000).

United States District Court
Northern District of California

1    or neurological abnormalities that I can find on the record, and the record extends for years." *Id.*

2    Dr. White testified there was no "physical basis" for Plaintiff's pain symptoms, including her

3    pelvic pain.  AR 69.

4          When asked whether Plaintiff had physical limitations, Dr. White testified Plaintiff should

5    stay away from environments with concentrated pollutants due to her asthma, and, depending on

6    what medications she was on, perhaps refrain from other activities such as climbing heights.  AR

7    71.  Dr. White continued:

8          But, otherwise, I don't see any limitations on an organic basis.  The
           only evidence that she may have something was that of the MRIs,
9          which showed some bulges, degenerative disc disease, but that alone
           is not sufficient if the patient does not show any physical or
10         neurological abnormalities.

11   *Id.*  Dr. White noted that other than Plaintiff's complaints of pain, there were no "physical or

12   neurological abnormalities that would equal or be [casually] tied to those bulges or degenerative

13   disc disease."  AR 71-72.  Dr. White concluded by noting that "there is really nothing physically

14   that would limit her significantly."  *Id.*

15         Plaintiff's attorney questioned Dr. White regarding the results of Plaintiff's 2007 MRI.

16   AR 72-76.  Plaintiff's attorney asked Dr. White if the MRI's findings, which included "moderate

17   to severe central stenosis that compresses the spinal cord," could "reasonably [cause] the kind of

18   pain that [Plaintiff] has?"  *Id.*  Dr. White responded:

19

20         Well, it would be reasonable to cause pain, but we cannot rely on an
           MRI solely because, according to the listings, the patient has to have
21         physical/neurological abnormalities.  As a matter of fact, her pain
           alone, without finding any physical abnormalities, is not really a
22         good indication for getting an MRI…. [P]ain is very difficult to
           judge. It is a subjective problem.  And this patient has a number of
23         other subjective problems like bloating and so on, so we can't rely
           just on the patient's description of the pain and the MRI showing the
24         abnormality because such abnormalities can be found in normal
           people walking on the street.
25

26   AR 74.

27         Plaintiff's attorney then went on to ask Dr. White if there are "patients described in

28   medical literature that continue to have pain after [surgery for fibroids]."  AR 75.  Dr. White

United States District Court
Northern District of California

1   testified, "there is a diagnosis of chronic pain syndrome, whereby the patient having pain, which

2   results and impresses itself in the brain and the patient continues to complain of pain." *Id.*

3   Nevertheless, Dr. White distinguished Plaintiff's case from those chronic pain cases by noting that

4   those patients had pain for years while Plaintiff "did not develop this pain but just a short time

5   ago." *Id.*

6          At this point in the proceeding, Plaintiff became noticeably upset when she was unable to

7   ask the doctor why, if they noticed a problem on her MRI, he said the pain was all in her head.

8   AR 76.  The ALJ informed Plaintiff that she would have to ask her lawyer, and that he would not

9   argue with her further.  *Id.* at 77.  The ALJ told Plaintiff, "You need to work."  *Id.*

10         The ALJ then questioned Robin Shearer, the vocational expert. Ms. Shearer noted that

11  Plaintiff's past work would be characterized as "a companion," and said this position is generally

12  characterized as "light, with an SVP of 3."  *Id.* at 78-79.  The ALJ remarked that Plaintiff had

13  previously reported that she regularly lifted 100 pounds in her past job, but Plaintiff denied ever

14  lifting 100 pounds, and said she never lifted more than five to ten pounds.  AR 79.  The ALJ

15  noted that "the light description would work," and then asked Ms. Shearer

16             to assume a hypothetical individual who has the same age, education
               and experience as Ms. Martinez, who has the additional capacity to
17             engage in exertional work at the following capacity: the ability to
               perform light work, including lifting and carrying up to 10 pounds
18             frequently and 20 pounds occasionally, the ability to sit stand and
               walk for six out of eight hours, however, for each position, with a
19             sit/stand option, though, at will….
20
               For mental capacity for this hypothetical person, they would be able
21             to engage in simple, repetitive, one to two step tasks; occasional and
               as minimal as possible, which I'll have to ask you something about,
22             contact with co-workers and supervisors; no public contact; and then
               a low-stress occupation defined as few changes in the work or its
23             setting and few decisions required.  And, finally, this hypothetical
               individual would also be off task up to ten percent of the workday.
24

25  AR 81-82.

26         When asked whether Plaintiff could return to her past work with the foregoing limitations,

27  Ms. Schearer concluded that "it would be a hard call."  AR 83.  Ms. Schearer testified this would

28  depend on the hypothetical person's ability to choose the people she works with; if they did not

14

1   get along with the person they were to be caring for, then "that really wouldn't work." *Id*.

2   However, Ms. Schearer also concluded if the hypothetical person were able to choose and screen

3   her clients, which was likely the case because of the self-employment situation, then they would

4   be able to do past work. *Id*. As to other occupations, Ms. Shearer also testified that could be a

5   router, a marker, or a coin machine collector. AR 84-88.

6   Plaintiff's attorney issued his own hypothetical individual to Ms. Schearer. AR 89. This

7   hypothetical person had the same physical and mental limitations as outlined by the ALJ, with the

8   additional limitation that the person would have to be off-tasks for 20% of the day. Ms. Shearer

9   responded that this person could likely perform past work as a companion because "most people in

10  the workforce are off task up to 20% of any given workday." *Id*.

11  Plaintiff's attorney issued his own hypothetical individual to Ms. Schearer. This

12  hypothetical person could occasionally lift less than ten pounds, stand and walk less than two

13  hours at an eight-hour work day, sit less than six hours out of an eight hour workday, and must

14  periodically alternate sitting and standing to relieve upper body pain and discomfort. AR at 93.

15  Ms. Schearer responded this hypothetical person could not keep a fulltime job, as they would be

16  limited to less than eight hours a day due to the "less than six hours" of sitting and the "less than

17  two hours" of standing and walking. AR at 93-94.

18      **E.      The Five Step Analysis**

19  A claimant is eligible for disability benefits under the Social Security Act if he is unable

20  "to engage in any substantial gainful activity by reason of any medically determinable physical or

21  mental impairment . . . which has lasted or can be expected to last for a continuous period of not

22  less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is

23  only disabled if his or her physical or mental impairments are of such severity that he cannot do

24  his previous work and "cannot, considering his age, education, and work experience, engage in

25  any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

26  423(d)(2)(A).

27  The Commissioner established a sequential five-step evaluation process to determine

28  whether a claimant meets this definition. 20 C.F.R. § 404.1520(a). If the Commissioner

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  concludes that the claimant is or is not disabled at one of the steps, the Commissioner does not

2  proceed to the next step. *Id.* at § 404.1520(a)(4). Otherwise, the evaluation proceeds to the next

3  step. The claimant bears the burden of proving Steps One through Four. *Parra v. Astrue*, 481

4  F.3d 742, 746 (9th Cir. 2007). At Step Five, the burden shifts to the Commissioner to prove that

5  the claimant can perform other work. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

6  　　At Step One, the Commissioner considers the claimant's work history. 20 C.F.R. §

7  404.1520(a)(I). If the claimant is doing "substantially gainful activity," the claimant is not

8  disabled. *Id.* If not, then the evaluation proceeds to Step Two. *Id.*

9  　　At Step Two, the Commissioner considers whether the claimant has a "severe medically

10  determinable physical or mental impairment" or combination of such impairments that has lasted

11  or is expected to last more than 12 months. *Id.* § 404.1520(a)(ii). An impairment is severe if it

12  "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* §

13  404.1520(c). "[T]he step two inquiry is a de minimis screening device to dispose of groundless

14  claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S.

15  137, 153-54 (1987)). "A claim may be denied at step two only if the evidence shows that the

16  individual's impairments, when considered in combination, are not medically severe, i.e., do not

17  have more than a minimal effect on the person's physical or mental abilit[ies] to perform basic

18  work activities." Social Security Ruling ("SSR") 85-28.[3] If medical evidence does not clearly

19  establish such a finding, the evaluation proceeds to the next step. *Id.*

20  　　At Step Three, the Commissioner compares the claimant's impairment(s) with a list of

21  impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(a)(iii).

22  If the impairment(s) "meets or equals" in severity an item on the list and meets the duration

23

24  　　　　[3] "The Commissioner issues Social Security Rulings to clarify the Act's implementing
25  regulations and the agency's policies." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir.
   2001). While "SSRs do not have the force of law," they are "binding on all components of the
26  SSA." *Id.* (citing 20 C.F.R. § 402.35(b)(1)). "[B]ecause they represent the Commissioner's
   interpretation of the agency's regulations," the Ninth Circuit gives them "some deference" unless
27  they are "inconsistent with the statute or regulations." *Id.* (citing *Bunnell v. Sullivan*, 947 F.2d
   341, 346 n. 3 (9th Cir. 1991) (*en banc*).

28

1     requirement, the claimant is disabled.  *Id.*  Otherwise, the Commissioner proceeds to Step Four.

2     *Id.*

3            At Step Four, the Commissioner considers the claimant's Residual Functional Capacity

4     ("RFC").  20 C.F.R. § 404.1520(a)(4)(iv).  A claimant's RFC is the most the claimant can do in

5     light of the physical and/or mental limitations caused by the impairment(s).  *Id.* § 404.1545.  If the

6     claimant can perform his past relevant work, he is not disabled.  *Id.*  Past relevant work is work the

7     claimant has done in the fifteen months prior to the evaluation and was substantial gainful activity

8     that lasted long enough for the claimant to learn to do it.  *Id.* § 404.1560(b)(I).  If the claimant

9     cannot perform his past relevant work, the evaluation proceeds to Step Five.  *Id.* § 404.1545.

10           At Step Five, the Commissioner considers whether the claimant, in light of the RFC, age,

11    education, and work experience, can make an adjustment to "other work" in the national economy.

12    *Id.* § 404.1520(a)(v).  If the claimant can make an adjustment to other work, she is not disabled.

13    *Id.*  If she cannot, she is disabled and eligible for disability benefits.  *Id.*

14           **F.      The ALJ's Findings of Fact and Conclusions of Law**

15           The ALJ issued his decision in Plaintiff's case on March 7, 2011.  *See* AR 19–28.  At Step

16    One, the ALJ found Plaintiff has not engaged in any substantial gainful activity since November 1,

17    2008, the alleged onset date.  AR at 21.  Thus, he continued to Step Two of the analysis.

18           At Step Two, the ALJ found Plaintiff had the following severe impairments: Anxiety

19    disorder, mood disorder, chronic pain disorder, and personality disorder.  *Id.*

20           At Step Three, the ALJ found the Plaintiff did not have an impairment or combination of

21    impairments that met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.

22    *Id.*  In support of this finding, the ALJ cited Dr. White's testimony that Plaintiff "mostly has pain

23    symptoms, with full range of motion on examination, no significant muscle atrophy, and no

24    neurological abnormalities.  AR 21.  The ALJ also noted that after a review of Plaintiff's MRI

25    results, an internal medicine consultative examiner found no evidence of low back radiculopathy

26    and as a result Plaintiff could "sit up to 6 hours a day, stand/walk 6 hours a day, lift 20 pounds

27    frequently and 40 occasionally" and that Plaintiff had a full range of motion in her neck.  AR 22.

28           With regards to Plaintiff's psychological health, the ALJ cited the diagnoses from Dr.

United States District Court
Northern District of California

17

1   Singer, who diagnosed Plaintiff with a mood disorder, pain disorder, and personality disorder, as

2   well as Dr. Johnson, who diagnosed Plaintiff with "a mood disorder with mixed moderate to

3   marked anxiety and depressive features," as well as a pain disorder and personality disorder.  AR

4   22-23.  Nevertheless, the ALJ found that Plaintiff's mental impairments, considered alone and in

5   combination, do not meet or medically equal the listings in 20 C.F.R. Part 404, Subpart P,

6   Appendix 1.  Specifically, the ALJ found that Plaintiff did not meet the listings 12.04, 12.06,

7   12.07 and 12.08.  AR 23.

8         With regard to whether Plaintiff "medically equals" a listing, the ALJ noted:

9
10
11
12
13

> [I]n order to satisfy the "paragraph B" criteria, the mental
> impairments must result in at least two of the following: Marked
> restriction of activities of daily living; marked difficulties in
> maintaining social function; marked difficulties in maintaining
> concentration, persistence or pace; or repeated episodes of
> decompensation, each of extended duration. A marked limitation
> means more than moderate but less than extreme.

14   *Id*.  The ALJ concluded Plaintiff has mild restrictions in daily living, as she cooks meals, helps

15   with household chores and feeds the dog.  *Id*.  The ALJ further concluded Plaintiff has moderate

16   difficulties in social functioning, as she has a history of belligerent and aggressive attitudes

17   towards healthcare providers.  AR 23.  With regards to concentration, persistence or pace, the ALJ

18   concluded Plaintiff has moderate difficulties due to a mild cognitive impairment.  *Id*.  The ALJ

19   found Plaintiff had not experienced any episodes of decompensating that have been extended in

20   duration.  *Id*.  The ALJ noted that Plaintiff did mention "a remote history of suicide attempt but

21   there [was] no documented psychiatric hospitalizations in the record."  *Id.*  Because the ALJ found

22   that Plaintiffs impairments do not cause at least two marked limitations or one marked limitation

23   and repeated episodes of decompensation, each of extended duration, the ALJ found the

24   "paragraph B" criteria were not satisfied.  *Id*.

25         At Step Four, the ALJ found Plaintiff had the following ("RFC"):

26
27
28

> . . .the claimant has the residual functioning capacity to perform
> light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)
> except for the following limitations: lift/carry 10 pounds frequently,
> 20 pounds occasionally; sit/stand/walk 6 hours in an 8hour day with

United States District Court
Northern District of California

> a sit/stand option at will; no ladder/rope/scaffold climbing; no overhead reaching or pushing/pulling above shoulder level; no crawling or kneeling; occasional crouching, crawling, stooping, and climbing of ramps/stairs; frequent balancing; no concentrated exposure to dust, gases, or fumes, or to wetness or dampness, or to extremes of heat; no exposure to industrial hazards (work at unprotected heights or with hazardous machinery); limited to simple repetitive 1-2 step tasks; occasional/minimal contact with coworkers and supervisors; no contact with the general public; limited to low stress occupations (few changes in work or its settings, and few decisions required); and off task up to 20% of the workday.

AR 24. In reaching this conclusion, the ALJ found Plaintiff's symptoms could be caused by her medically determinable impairments; however, the Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms was not credible to the extent they were inconsistent with the RFC. *Id*. The ALJ noted that Plaintiff "stated in a treatment note that she has been building a case for 15 years to get social security benefits." *Id*. Additionally, the ALJ noted that Plaintiff "has reported that the only reason she is staying in treatment [for her mental health issues] 'is SSI.'" *Id*.

The ALJ further based the RFC on his findings that the Plaintiff gave inconsistent reports of her treatment history and employment history. The ALJ pointed to Plaintiff's testimony describing her recovery from varicose vein surgery as an example. AR 25. Plaintiff initially described her recovery from the surgery as "being in leg wraps for one month" while at the hearing she stated that she needed three months to recover. *Id*. The ALJ also noted Plaintiff's inconsistency with regards to how much she lifted in her previous employment (Plaintiff originally reported she lifted up to one hundred pounds in her work history report while at the hearing she said she lifted ten pounds at most). *Id*.

Additionally, the ALJ found Plaintiff had no physical basis for her multiple symptoms according to Dr. White, the internal medical expert. *Id*. The ALJ noted Plaintiff declined suggested therapies for her pain symptoms and that "her perceived disability is the focus of her life and that she pursues treatment to attempt to qualify for disability benefits." AR 23.

The ALJ gave great weight to the opinions of both Dr. Singer and Dr. White "as they have had the opportunity to review claimant's entire medical record and listen to all of her testimony."

AR at 26.  The ALJ gave significant weight to Dr. Johnson, the consultative examiner.  While Dr. Johnson found that Plaintiff would have "moderate to marked" difficulties in working with others, the ALJ concluded that given the record as a whole, Plaintiff "would be more toward the 'moderate' end of that spectrum.  *Id*.  The ALJ noted that Plaintiff generally has been given a GAF of 55-60, which indicates a moderate to mild impairment.  *Id*.  Additionally, the ALJ gave significant weight to the opinions of Dr. Yakimovich-Maurer, who gave Plaintiff a GAF score of 60, and Dr. Chu, who gave plaintiff a GAF score of 55.  *Id*.  The ALJ gave less weight to Dr. Senter, as her restrictive RFC was inconsistent with the medical evidence of record.  *Id*.

At Step Five, the ALJ found Plaintiff was able to perform her past relevant work as a companion because she has the opportunity to interview her customers "to find one she could work for in a self-employment situation."  *Id*.  Based on the testimony of the vocational expert in response to his RFC, the ALJ concluded "considering the claimant's age, education, work experience, and [RFC], the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  AR at 27.  The ALJ ruled Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 1, 2008, through the date of [the] decision."  AR at 27.

### G.    New Medical Evidence Submitted to the Appeals Council

On August 12, 2011, after the ALJ issued his decision, Plaintiff submitted additional evidence to the Appeals Council accompanied by a brief written by Plaintiff's attorney.  AR 297-99 (brief).  The evidence consists of: (1) a X-ray of Plaintiff's lumbar spine taken on March 10, 2011 (AR 894-95); (2) a MRI of Plaintiff's lumbar spine taken on March 27, 2011 (AR 896-98); (3) a MRI of Plaintiff's cervical spine taken on April 27, 2011 (AR 899-901); and (4) a discharge summary written by the California Pacific Medical Center in San Francisco on February 22, 2011, following a two-day involuntary hospitalization after Plaintiff attempted suicide (AR 902-04).

The x-ray of the lumbar spine revealed "[s]evere disk space narrowing" affecting the L4-L5 level, with milder narrowing noted at L5--S1.  AR at 895.  The MRI of the lumbar spine revealed:

> (1) Marked bone marrow edema pattern of the L4 and L5 vertebral bodies as above with additional disk bulges at these levels which

> result in severe right lateral recess/neural foraminal stenosis at L4-
> L5 and moderate to severe right neural foraminal narrowing at L5-
> S1.  Although these findings likely represent erosive degenerative
> disk disease, given the degree of bone marrow edema a low grade
> infectious process cannot be excluded.  Recommend MRI follow-up
> in two months to ensure stability.
>
> (2)  Multilevel degenerative disk disease as above from L2-L3
> through L5-S1.

AR at 898.  The MRI of the cervical spine revealed:

> Multilevel degenerative disk disease, severe at C4-C5 and C5-C6
> where there is narrowing of the spinal canal, mass effect upon the
> ventral cord and up to severe neural foraminal stenosis as described.
> Cervical cord maintains normal signal.

AR 901.

Plaintiff also submitted a discharge summary written by the California Pacific Medical

Center in San Francisco on February 22, 2011, written after a two-day hospitalization following a

suicide attempt.  AR 902-04.  Plaintiff had been held in the hospital for fear that she was a danger

to herself.  AR 903.  In the discharge summary, the following notes were made under the section

"depression and suicidality":

> The patient was on suicide 1 precautions.  She stated that she took
> the pills so that she could sleep and never wake up since things were
> not going her way.  She admitted that she had had frequent suicidal
> ideation for years, whenever she is treated unfairly or has
> interpersonal problems.  She has made multiple suicide attempts,
> mostly by overdose on pills.  The main stressor for this episode was
> discovering that she had been denied disability the week prior, and
> also having gotten stuck in traffic, which ruined her plans to go out
> to dinner.  While in the hospital, the patient was irritable,
> complained frequently of pain and was not participatory in groups.
> She complained of depression when specifically asked if she was
> depressed, but otherwise state her mood was "in pain" or "annoyed."
> She denied suicidal ideation throughout hospitalization, but stated if
> she went home she might take something to fall asleep.  The patient
> was felt safe to return home on 2/22/2011 with a follow-up
> appointment at Sunset Mental Health on 3/03/2011.

AR 903.  Plaintiff contends that the discharge summary also says that she has a GAF score of 50.

*See* AR 904 ("Axis V: 50").

United States District Court
Northern District of California

1                                           *      *      *

2          As noted above, the Appeals Council denied Plaintiff's request for review of the ALJ's

3   decision, which rendered the ALJ's decision the final, appealable decision of the Commissioner in

4   this case.  AR 1.

5          **H.      Plaintiff's Motion for Summary Judgment**

6          Plaintiff argues that the Commissioner's decision should be reversed for several reasons.

7   First, Plaintiff asserts that the ALJ's RFC was ambiguous as it conflated two separate functional

8   categories—(1) "standing and/or walking" and (2) "sitting."  Plaintiff's Motion at 5; *see also* AR

9   at 24, 82.  Plaintiff contends that it was legal error to combine the categories of "standing and/or

10  walking" and "sitting" in the RFC because they are two separate functional categories in the

11  regulations.  *See* 20 C.F.R. §§ 404.1567(a)-(b), 416.96(a)-(b).   Plaintiff contends that it is

12  impossible to determine how many hours in an eight-hour day the ALJ thought Plaintiff was

13  capable as to each of the two categories.  In addition, Plaintiff notes that the vocational expert

14  testified in response to the ALJ's faulty RFC, and argues that because the ALJ relied on the

15  vocational expert's testimony, the ALJ lacked substantial evidence supporting the RFC.

16         Next, Plaintiff appears to argue that the ALJ's RFC was not supported by substantial

17  evidence because the ALJ gave insufficient weight to the RFC suggested by Plaintiff's treating

18  physician, Dr. Senter.  Dr. Senter reported that Plaintiff could occasionally lift less than 10

19  pounds, stand and/or walk for less than 2 hours, and sit less than 6 hours in an 8-hour workday.

20  Plaintiff argues that if that if the Court credits Dr. Senter's opinion as a matter of law, then remand

21  for payment of benefits is the proper remedy.

22         Finally, Plaintiff contends that in light of the new medical evidence submitted to the

23  Appeals Council, which is considered part of the Administrative Record, the ALJ's decision is not

24  supported by substantial evidence.  Plaintiff argues that the X-ray and MRIs taken in March and

25  April of 2011 relate back to the period on or before the date of the ALJ decision because they

26  show changes that occurred from 2007.  Plaintiff also argues that the X-ray and new MRIs show

27  that the degree of impairment worsened overtime.  Plaintiff contends that the discharge summary

28  following the suicide attempt, which noted a GAF score of 50 (which was lower than the ALJ's

United States District Court
Northern District of California

22

1    GAF score of 55-60), also shows that the ALJ's decision was not supported by substantial

2    evidence.

3    **I.     Defendant's Motion for Summary Judgment**

4          Defendant contends the Court should affirm the decision of the ALJ because there was no

5    legal error and the decision is supported by substantial evidence.  First, Defendant argues that the

6    ALJ's RFC is not ambiguous because, when read in context of the entire transcript and decision, it

7    was clear that the ALJ believed that Plaintiff could perform "light work."  Defendant points to the

8    fact neither Plaintiff's attorney nor the vocational expert asked for clarification regarding the

9    ALJ's RFC.

10         As to the opinion of Dr. Senter, Defendant argues that the ALJ considered this opinion

11   Plaintiff provides no evidence or argument to the contrary.  In addition, Defendants contend that

12   Plaintiff did not contest the weight the ALJ accorded to Dr. Senter in the opposition brief, and

13   therefore waived this argument.

14         With respect to the new evidence admitted for the first time to the Appeals Council,

15   Defendant concedes that under Ninth Circuit precedent, evidence submitted to the first time to the

16   Appeals Council becomes part of the administrative record, "which the district court must consider

17   in determining whether the Commissioner's decision is supported by substantial evidence."

18   *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012) (declining to apply

19   the good cause and materiality standards in 42 U.S.C. § 405(g) for new evidence submitted to the

20   district court).  Nevertheless, Defendant argues that, considering the record as a whole, the new

21   evidence that Plaintiff submitted to the Appeals Council does not change the fact that substantial

22   evidence supports the ALJ's decision.  Defendant notes that the Appeals Council need only

23   consider the evidence if "it relates to the period on or before the date of the administrative law

24   judge hearing decision," 20 C.F.R. §  404.970(b), and argues that because the evidence submitted

25   to the Appeals Council is dated *after* the ALJ's March 7, 2011 decision, it does not relate to the

26   relevant period.  Defendant contends that Plaintiff submitted MRIs dated "just before and just

27   after" the relevant period, and there is no evidence that the latter MRIs are more indicative of her

28   condition during the relevant period.

United States District Court
Northern District of California

1    As to the discharge summary from the California Pacific Medical Center that followed

2    Plaintiff's suicide attempt, Defendant argues it is "not probative" and does not change the

3    substantial evidence supporting the ALJ's decision.  Defendant notes that the discharge summary

4    indicates that Plaintiff said her episode was triggered by her "discovering that she had been denied

5    disability the week prior" and also getting caught in traffic.  Defendant contends this supports the

6    ALJ's finding that Plaintiff was not as limited as she claimed.  Defendant also argues that the fact

7    Plaintiff's GAF score of 50 was lower than her previous GAF score of 55-60 is not probative

8    because a GAF score only provides a snapshot of an individual's level of functioning and is not

9    synonymous with disability.

10   **III.    LEGAL STANDARD**

11   When asked to review the Commissioner's decision, the Court takes as conclusive any

12   findings of the Commissioner which are free from legal error and supported by "substantial

13   evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind

14   might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401

15   (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial

16   evidence means "more than a mere scintilla," but "less than a preponderance."  *Desrosiers v. Sec'y*

17   *of Health and Human Serv.*, 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted).  Even if the

18   Commissioner's findings are supported by substantial evidence, they should be set aside if proper

19   legal standards were not applied when using the evidence to reach a decision.  *Benitez v. Califano*,

20   573 F.2d 653, 655 (9th Cir. 1978).

21   In reviewing the record, the Court must consider both the evidence that supports and

22   detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

23   1996); *see also Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  "The ALJ is responsible for

24   determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."

25   *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d

26   747, 750 (9th Cir. 1989)).  The Court "must uphold the ALJ's decision where the evidence is

27   susceptible to more than one rational interpretation."  *Id.* at 1039-40.  However, a reviewing court

28   must consider the entire record as a whole and may not affirm simply by isolating a "specific

United States District Court
Northern District of California

24

1   quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)

2   (citing *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir.1989)).

3   **IV.     DISCUSSION**

4           **A.       Whether the ALJ's RFC was Ambiguous such that he Committed Legal Error**

5           The heart of Plaintiff's Motion challenges the sufficiency of the evidence supporting the

6   ALJ's decision.  Plaintiff also argues, however, that the ALJ committed legal error by articulating

7   an ambiguous RFC which conflated the two separate functional categories of "sitting" and

8   "standing and/or walking."  Plaintiff's Motion at 5.  In his decision, the ALJ wrote that Plaintiff

9   "has the residual functional capacity to perform *light work* as defined in 20 C.F.R. § 404.1567(b)

10  and 416.967(b)," with certain limitations including that Plaintiff can only "*sit/stand/walk* 6 hours

11  in an 8-hour day with a sit/stand option at will."  AR at 24 (emphasis added).

12          Plaintiff argues that it is impossible to determine, from the ALJ's RFC, how many hours

13  the ALJ believed Plaintiff to be capable of sitting, standing and walking.  Plaintiff also argues that

14  the ALJ's RFC even suggests that the ALJ determined Plaintiff could only sit, stand and walk for

15  a "total" of six hours.  The parties agree that if Plaintiff could only sit, stand and walk for a "total"

16  of six hours, then she would be unlikely to be able to work for 8-hours per day, and would likely

17  not be able to work full-time.  In response, Defendant argues that, when the opinion is read in its

18  entire context, the ALJ clearly meant to hold that Plaintiff could fill an eight hour workday by

19  sitting up to six hours, and standing or walking up to six hours.

20          The Court acknowledges that the ALJ's choice of words—"sit/stand/walk"—does not

21  clearly indicate what the ALJ meant.  Nevertheless, the Court agrees with Defendant that Plaintiff

22  is creating confusion where there is none.  Read in its proper context, it is clear that the ALJ meant

23  that Plaintiff could sit for six hours, and stand or walk for six hours in an eight-hour workday.

24  Immediately preceding the ALJ's conclusion that Plaintiff could "sit/stand/walk" for six hours, the

25  ALJ wrote that Plaintiff could perform "light work."  AR.  The regulations define "light work" as

26  requiring "a good deal of walking or standing." 20 C.F.R. § 404.1567(b) and 416.967(b).  The

27  SSA has noted that "the full range of light work requires standing *or* walking, off and on, for a

28  total of approximately 6 hours of an 8-hour workday."  SSR 83-10 (emphasis added).  Moreover,

1   Dr. Bradus opined that Plaintiff could "stand and/or walk (with normal breaks for about 6 hours in

2   an 8-hour work day," *and also* "sit (with normal breaks) for a total of about 6 hours in an 8-hour

3   work day."  AR 328.  Similarly, Dr. Grable believed that Plaintiff "could stand and walk possibly

4   up to six hours depending upon her degree of pain."  AR 323.  The foregoing regulations, as well

5   as the opinions of Dr. Bradus and Dr. Grable, are consistent with the ALJ's description of the

6   RFC.

7           In addition, by holding that Plaintiff could perform "light work," the ALJ found that

8   Plaintiff could hold a full-time job.  If the ALJ had meant to hold that Plaintiff could only sit,

9   stand "and" walk for a "total" of six hours, then clearly, Plaintiff would not be able to work an

10  eight-hour workday, and therefore, would not be able to hold a full-time job.  *See* AR at 93 (the

11  vocational expert testified that sitting less than six hours and standing/walking less than two hours

12  "would not equal an eight-hour workday and, therefore, this hypothetical person probably couldn't

13  keep a job, a full-time job").  If Plaintiff were limited to sitting, standing "and" walking for a

14  "total" of six hours, then Plaintiff would not even be able to perform "sedentary work," which

15  requires less than "light work."  *See* 20 C.F.R. § 404.1567(a) and 416.967(a).  Accordingly, the

16  Court finds that the ALJ's intent in articulating the RFC was clear, and no legal error resulted.

17       **B.       Whether the ALJ's Decision is Supported by Substantial Evidence**

18          Plaintiff contends the ALJ's decision is not supported by substantial evidence for three

19  reasons.  First, Plaintiff contends that there is insufficient evidence supporting the ALJ's RFC

20  because the ALJ relied on the testimony of the vocational expert, who relied on the ALJ's

21  hypothetical of an ambiguous RFC.  Second, Plaintiff argues that the ALJ erred by giving

22  insufficient weight to her primary physician, Dr. Senter.  Third, Plaintiff contends that in light of

23  the new evidence submitted to the Appeals Council, the ALJ's decision is not supported by

24  substantial evidence.  The Court finds that only the Plaintiff's last argument has merit.

25                  **1.      *Hypothetical with Ambiguous RFC***

26          In addition to contending that the ALJ committed legal error by articulating an ambiguous

27  RFC, Plaintiff also contends that the ALJ's decision is not supported by substantial evidence

28  because of the ambiguous RFC.  This is because the ALJ relied on the testimony of the vocational

United States District Court
Northern District of California

expert, who relied on the ALJ's hypothetical of an ambiguous RFC.  Specifically, at the hearing, the ALJ posed for the vocational expert a hypothetical where the individual had "the ability to sit stand and walk for six out of eight hours, however, for each position, with a sit/stand option, though, at will."  AR 82.  The vocational expert responded that a person with the limitations described in the hypothetical could perform the past work of Plaintiff's, as well as other jobs that exist in significant numbers in the national economy.

The Court has already held that, when read in its entire context, the RFC is not ambiguous. Like the RFC written in the ALJ's opinion, the RFC posed to the vocational expert during the hearing is not ambiguous, as the ALJ's intent was clear.  Moreover, there is no indication the vocational expert was confused about this point during the hearing.  The vocational expert did not indicate that she needed clarification.  *See* AR at 82.  Neither did Plaintiff nor her attorney. Rather, it was clear that the ALJ was providing a hypothetical for a person able to perform "light work."  *See id.*

### 2.     *Dr. Senter*

Plaintiff's treating physician, Dr. Senter, wrote a report indicating that Plaintiff could occasionally lift less than 10 pounds, stand and/or walk for less than 2 hours, and sit less than 6 hours in an 8-hour workday (while having to periodically sit and stand to relief pain or discomfort).  AR 830-31.  In his order, the ALJ wrote that he was giving "less weight" to the opinion of Dr. Senter because it was "inconsistent with the medical evidence of record" and that "the claimant's treatment records do not support the restrictive residual functional capacity described by Dr. Senter."  AR 26.  Plaintiff argues that ALJ's RFC is not supported by substantial evidence because the limitations proposed by Dr. Senter should be treated "as a matter of law." Plaintiff's Motion at 9.

Opinions of treating physicians are given "controlling weight" when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  The ALJ may only reject the uncontroverted opinion of a claimant's treating physician by presenting clear and convincing

1    reasons for doing so.  *See id.*  In this case, however, the limitations noted by Dr. Senter are

2    inconsistent with the limitations noted by Dr. Bradus and Dr. Grable, who, after examination and

3    review, suggested that plaintiff could sit, stand or walk for six hours in an 8-hour workday. AR

4    328.

5            "[T]he ALJ may reject the opinion of a treating physician in favor of a conflicting opinion

6    of an examining physician if the ALJ makes 'findings setting for the specific, legitimate reasons

7    for doing so that are based on substantial evidence in the record.' "  *Thomas v. Barnhart,* 278 F.3d

8    947, 957 (9th Cir.2002) (quoting *Magallanes*, 881 F.2d at 751).  "The ALJ can meet this burden

9    by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

10   stating his interpretation thereof, and making findings."  *Embrey v. Bowen*, 849 F.2d 418, 421-22

11   (9th Cir. 1988).  Notably, while Plaintiff argues that Dr. Senter's opinion should be treated "as a

12   matter of law," Plaintiff does not argue that the ALJ erred by failing to provide "specific,

13   legitimate reasons … based on substantial evidence" for rejecting the opinion of Dr. Senter.

14           The ALJ indeed provided specific and legitimate reasons explaining why the opinion of

15   Dr. Senter was inconsistent with the evidence.  AR 25-26.  The ALJ referenced Dr. White's

16   testimony that "[t]here is no physical basis for claimant's multiple symptoms and complaints of

17   pain…."  AR 25.  The ALJ also noted that "Claimant's own treating physicians also note there is

18   no organic basis for her pain complaints."  *Id.* (citing AR 785).  He also mentioned that "claimant

19   is also described in as noncompliant in her treatment and very rude with unrealistic goals," and

20   "has declined suggested therapies for her pain symptoms."  AR 25.  Accordingly, the ALJ did not

21   error by failing to give the opinion of Dr. Senter controlling weight.

22           Moreover, the Court notes that the reason the opinion of a treating physician is given more

23   weight is because the treating physician is "employed to cure and has a greater opportunity to

24   know and observe the patient as an individual."  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.

25   1987); *see also* 20 C.F.R. § 404.1527(c)(2)(i) ("*When the treating source has seen you a number

26   *of times and long enough to have obtained a longitudinal picture of your impairment*, we will give

27   the source's opinion more weight than we would give it if it were from a nontreating source.")

28   (emphasis added).  In this case, however, Plaintiff only cites to one report by Dr. Senter, and there

United States District Court
Northern District of California

1    is no indication in this report that Dr. Senter had ever treated Plaintiff on a prior occasion.  *See* AR

2    830-33.  Moreover, in the report, Dr. Senter merely checks certain boxes noting Plaintiff's

3    limitations, and provides little to no written evaluation regarding Plaintiff's impairments.  There

4    are no clinical findings aside from Plaintiff's own complaints of "pain."  The Ninth Circuit has

5    held that an "ALJ need not accept the opinion of any physician, including a treating physician, if

6    that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v.*

7    *Barnhart*, 278 F.2d 947, 957 (9th Cir. 2002).  Dr. Senter's opinion lacked indicia of a treatment

8    relationship, which would have made Dr. Senter's opinion deserving of more weight.

9               **3.     *New Evidence Submitted to Appeals Council***

10           The final issue in this case is whether the ALJ's opinion is still supported by substantial

11   evidence when taking into account new evidence submitted for the first time to the Appeals

12   Council, which the ALJ did not have a previous opportunity to consider.  The Ninth Circuit has

13   held that "when a claimant submits evidence for the first time to the Appeals Council, which

14   considers that evidence in denying review of the ALJ's decision, the new evidence is part of the

15   administrative record, which the district court must consider in determining whether the

16   Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec.*

17   *Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012).

18           The parties agree that pursuant to *Brewes*, this Court must determine whether the ALJ's

19   decision is supported by substantial evidence while taking into account the new evidence

20   submitted for the first time to the Appeals Council.  Defendant argues, however, that the new

21   evidence need not be considered because it does not "relate to" the time period prior to the ALJ's

22   decision.  *See* 20 C.F.R. § 404.970(b).  Defendant also argues that the even taking into account the

23   new evidence, the ALJ's opinion is still supported by substantial evidence.  The Court disagrees,

24   and finds that this case must be remanded for reconsideration of Plaintiff's impairments and

25   limitations in light of the new evidence.

26   //

27   //

28

United States District Court
Northern District of California

1

2

**i.      The New Evidence "Relates to" the Time Period Before the ALJ's Decision**

3

4        The SSA regulations require the Appeals Council to evaluate the new evidence "if it relates

5   to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. §

6   404.970(b).  Defendant contends that the evidence submitted to the Appeals Council does not

7   relate to this period because the evidence was gathered *after* the date of the ALJ's decision.

8   The Court finds this argument to be without merit.

9        The new evidence consists of MRIs from March and April of 2011 and a discharge

10   summary following Plaintiff's suicide attempt in late February of 2011.  The relevant period is

11   between November 1, 2008, the alleged onset date of Plaintiff's disability, and March 7, 2011, the

12   date of the ALJ's decision.  Because the discharge summary regarding Plaintiff's suicide attempt

13   was prepared on February 22, 2011, *before* the ALJ's decision, it clearly relates to the relevant

14   period.

15        The X-ray and MRIs were taken in March and April of 2011, just days and weeks after the

16   ALJ rendered his decision on March 7, 2011.  Nevertheless, this evidence still relates to the period

17   before the ALJ's decision because it permits a comparison of the changes to Plaintiff's spine that

18   occurred after the 2007 MRIs were taken.  *See Oliver v. Astrue*, No. 11-04354, 2013 WL 211131

19   (N.D. Cal. Jan. 16, 2013) (Beeler, J.) (evidence submitted to the Appeals Council related to the

20   time before the ALJ's decision because Asperger's Disorder is "a developmental disorder, not a

21   condition which suddenly appeared after hearing.").  Moreover, most of the time between the two

22   sets of MRIs (July 2007 to March/April 2011) was time that overlaps with the relevant period

23   (November 1, 2008 to March 7, 2011).  Therefore, the Court finds that the new evidence is

24   "related to" the time period before the ALJ's decision.  20 C.F.R. § 404.970(b).

**ii.      The ALJ's Opinion is Not Supported by Substantial Evidence When Taking into Account the New Evidence**

25        As explained above, while the ALJ found that Plaintiff had severe impairments consisting

26   of an anxiety disorder, a mood disorder, a chronic pain disorder and a personality disorder, he also

27   found that these impairments, alone and in combination, did not meet or medically equal the

28

30

United States District Court
Northern District of California

1    listings. AR 22. The ALJ found that Plaintiff had a residual functional capacity to perform "light

2    work" with a few, additional restrictions, and held that Plaintiff could perform past work as well

3    as other work that exists in significant number in the national economy. *Id*. at 24-28.

4         In discussing Plaintiff's residual functional capacity, the ALJ undertook "a two-step

5    process" in which he first determined that Plaintiff had "medically determinable impairments

6    [that] could reasonably be expected to cause [her] alleged symptoms." AR 25. In the second step

7    of the analysis, the ALJ evaluated the "intensity, persistence, and limiting effects of the claimant's

8    symptoms to determine the extent to which they limit the claimant's functioning." AR 24. At this

9    step, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting

10   effects of these symptoms are *not credible* to the extent they are inconsistent with the above

11   residual functional capacity assessment." *Id*. (emphasis added).[4]

12        The new evidence submitted to the Appeals Council show that Plaintiff's mental

13   impairments, which the ALJ already considered "severe," may be worse than initially determined

14   by the ALJ. The evidence may also show that Plaintiff's degenerative disc disease became worse

15   since her 2007 MRIs. The new evidence may therefore corroborate Plaintiff's subjective

16   complaints of pain, which may cause the ALJ to find Plaintiff more credible. "The ALJ is

17   responsible for determining credibility, resolving conflicts in medical testimony, and for resolving

18   ambiguities." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir.1995). Accordingly, this case

19   must be remanded to the ALJ for consideration of the new evidence.

20                    **a.    *Discharge Summary re Plaintiff's Suicide Attempt***

21        Plaintiff submitted a discharge summary dated February 22, 2011 that was written by the

22   California Pacific Medical Center following a two-day hospitalization after Plaintiff took

23   numerous pills in a suicide attempt. *See* AR 903-04. The discharge summary notes that the "main

24

25         [4] "Unless there is affirmative evidence showing that the claimant is malingering, the
26   Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing."
     *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) (quoting *Swenson v. Sullivan,* 876 F.2d 683,
27   687 (9th Cir. 1989)). In her Motion, Plaintiff does not argue that the ALJ erred in providing "clear
     and convincing" reasons for the adverse credibility determination. Accordingly, the Court does
28   not consider whether the ALJ erred in rejecting Plaintiff's testimony to a certain extent.

1   stressor for this episode was discovering that she has been denied disability the week prior, and

2   was also having gotten stuck in traffic, which ruined her plans to go out to dinner." *Id*. at 903.

3   The discharge summary says that Plaintiff was involuntary admitted to the hospital because she

4   was a "danger to self." *Id*.

5        The discharge summary shows that Plaintiff's mental impairments are likely more severe

6   than the ALJ initially determined.  In his decision, the ALJ wrote that "[t]he claimant mentions a

7   remote history of suicide attempt but there are no documented psychiatric hospitalizations in the

8   record." AR 23.  The discharge summary clearly fills that gap.

9        The ALJ also wrote that Plaintiff had a GAF score of 55-60, which indicates a "mild"

10  mental impairment. AR 26.  The discharge summary indicates, however, that Plaintiff had a GAF

11  score of 50, which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional

12  rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school

13  functioning (e.g., no friends, unable to keep a job)."  American Psychiatric Association,

14  *Diagnostic and Statistical Manual of Mental Disorders* at 32 (4th Ed. 2000).  "The Commissioner

15  has determined the GAF scale does not have a direct correlation to the severity requirements in

16  [the Social Security Administration's] mental disorders listings."  *McFarland v. Astrue*, 288 F.

17  App'x 357, 359 (9th Cir. 2008) (unpublished) (citing 65 Fed.Reg. 50,746, 50,765 (Aug. 21,

18  2000)).  Nevertheless, the GAF score of 50 in the discharge summary conflicts with the higher,

19  earlier GAF scores of 55 and 60, upon which the ALJ clearly relied when making his decision.

20  *See* AR 26.

21       The discharge summary also notes that Plaintiff has "a reported history of bipolar

22  disorder." AR 903.  This is consistent with other evidence in the record, which is replete with

23  suggestions that Plaintiff may suffer from bipolar disease.  Plaintiff's psychiatric evaluation notes

24  that she may suffer from bipolar affective disorder.  AR 303.  The examination at UCSF's

25  Multiple Sclerosis Center indicated that Plaintiff's "clinical history is most suggestive of bipolar

26  type 1 disease, and noted that the "T2 white matter abnormalities" found in Plaintiff's 2007 MRIs

27  "have been reported with some frequency in this context."  AR 311.

28       This evidence may also change the ALJ's assessment of the findings of Dr. Johnston, the

United States District Court
Northern District of California

32

1    psychiatrist who examined Plaintiff.  Dr. Johnston found that Plaintiff would have "difficulties,

2    even marked, in the context of requirements to fulfill a full 8-hour workday or full 40-hour week."

3    AR 319.  Dr. Johnson also wrote that Plaintiff "would have moderate to marked difficulties

4    communicating effectively with others in a work environment that required coordination and back-

5    and-forth tasks-oriented communications."  *Id*.  In finding that Plaintiff did not meet or medically

6    equal a listing, the ALJ considered Dr. Johnston's report, and found that "the overall evidence of

7    record supports a finding that the claimant's difficulties would be more towards the lower

8    'moderate' end of that spectrum."  *Id*.  If the ALJ finds that Plaintiff has "marked" limitations for

9    her "difficulties in maintaining social function" as well as "difficulties in maintaining

10   concentration, persistence or pace," then Plaintiff would likely equal the listing for 12.04, which

11   covers affective disorders.

12           Finally, it is worth noting that the discharge summary may corroborate Plaintiff's own

13   testimony regarding her mental impairments.  At the hearing, Plaintiff testified that she "can't

14   even get out of the house most of the time" and that she feels she does not belong anywhere.  AR

15   44-45.  In his decision, the ALJ wrote that "[t]he claimant appears to want to convince her

16   evaluators that she is mentally ill."  AR 25.  The fact Plaintiff attempted suicide and was

17   involuntarily admitted to a hospital suggests that her testimony may be more credible than initially

18   believed.  The Court finds that the discharge summary is new, material evidence that should be

19   considered by the ALJ.

20                          **b.     *X-ray and New MRIs***

21           Plaintiff contends that both of the 2011 MRIs "show considerably more severe conditions

22   than shown in the 2007 MRI reports," and points to specific language used in the radiologists'

23   reports where the language used suggests a worsening condition.  For instance, with respect to the

24   lumbar spine, the 2007 MRI report noted "disc bulge" at L2-L3, L3-L4, L4-L5, as well as L5-S1,

25   but reported "no spinal canal or neural forminal stenosis" at any level.  AR 313.  The 2011 MRI

26   reports disk bulge at the same level, and notes that the disk bulge at L4-L5 "result in severe right

27   lateral recess/neural foraminal stenosis."  AR 898.

28           With respect to the cervical spine, the 2007 MRI report noted:

United States District Court
Northern District of California

1

2

3

> *Moderate* central stenosis of the C4-5. C5-6 and C6-7 levels secondary to postier central disk herniations with dorsal ridging of the vertebral body endplates. This is most pronounced at the C5-6 level. The spinal chord is slightly compressed; however, there is no evidence of cord edema at any level.

4    AR 315 (emphasis added). Plaintiff compares and contrasts the 2011 MRI report of the cervical

5    spine, which noted:

6

7

8

> Multilevel degenerative disk disease, severe at C4-C5 and C5-C6 where there is narrowing of the spinal canal, mass effect upon the ventral cord and up to *severe* neural foraminal stenosis [at C4-C5 and C5-C6]. Cervical cord maintains normal signal.

9    AR 901 (emphasis added).

10        The Court agrees that some of the language used in the 2011 MRIs may suggest a

11   worsening of Plaintiff's degenerative disc disease. The ALJ noted in his decision that the 2007

12   thoracic MRI showed "some degenerative changes of the cervical spine," and further noted that

13   the 2007 cervical MRI "showed moderate central stenosis of C4-5, C5-6 and C6-7 due to disc

14   herniations and multilevel bilateral neural foraminal stenosis." AR 22. Despite noting these

15   irregularities, the ALJ believed that Plaintiff's complaints of pain were not credible (to the extent

16   inconsistent with his RFC). The ALJ found support in the opinion of Dr. White, who reviewed

17   Plaintiff's MRIs from 2007, and testified that the abnormalities found in these MRIs "can be

18   found on normal people walking on the street." AR 74. If the new MRIs show a worsening of

19   Plaintiff's degenerative disk disease, then Plaintiff's subjective complaints of pain would be

20   supported by more objective medical evidence. This, in turn, may augment the ALJ's assessment

21   of Plaintiff's credibility, and a support a finding that Plaintiff is either disabled or has a more

22   restrictive RFC.

23        Accordingly, when taking into account the new evidence submitted to the Appeals

24   Council, the Court concludes that the ALJ's decision is not supported by substantial evidence.

25   **V.        CONCLUSION**

26        For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment,

27   DENIES Defendant's Cross-Motion for Summary Judgment, REVERSES the decision of the ALJ

28   and REMANDS the case for further proceedings.

34

United States District Court
Northern District of California

1        **IT IS SO ORDERED.**

2    Dated: January 28, 2014

3    _____

4    JOSEPH C. SPERO
     United States Magistrate Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28